UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ASHLEY PASTOR AND APRIL LACKO | : | NO. 3:16-cv-00812(MPS) |
| Plaintiffs, | : | |
| v. | : | |
| GEAUX FISH FAIRFIELD, LLC, | : | |
| Defendant | : | |

### AFFIDAVIT OF ASHLEY PASTOR IN SUPPORT OF PREJUDGMENT REMEDY

***Ashley Pastor***, being duly sworn, hereby deposes and says:

1. I am over the age of 18 and believe in the obligation of an oath to tell the truth.

2. I make the following statements based on my personal knowledge, except for those statements made on information and belief, which I believe to be true and accurate.

3. I was employed at Local Beer Bar Restaurant, which is owned by defendant, from December 2013 through July 17, 2015. I involuntarily resigned my position as a server on July 17, 2015 as a result of my work conditions.

4. During my tenure at Local, I always had a positive performance record.

5. One thing I did notice, however, was that my paychecks seemed inaccurate, and did not reflect the correct number of hours that I worked in a given pay period.

6. Dating back to November 2014, I used my access to the payroll system to access my time card records. I noticed that there were several occasions where my time card punches were altered to reflect an earlier time out, when those alterations were inaccurate. The alterations appear to have been made so that my manager, Christian

Minnery, could avoid having to pay me overtime. For many of the weeks I worked, the alterations appear to be in excess of 20 hours pay per week.

7. During my employment, I observed inappropriate behavior from Christian Minnery. Specifically, there was a laminated beer list with several grossly offensive and sexually suggestive names that Christian assigned to beer. It made me very uncomfortable and was posted in his office in full view of female employees.

8. Starting in June 2015, I pointed out that I noticed the significant difference between the number of hours I was working, versus the number of hours I was actually paid for.

9. Once I vocalized my observation to Minnery, and began to ask other employees if they also experienced the same discrepancies with their paychecks, there was a major difference in the way I was treated while I was at work. I lost my keys, my access to the manager's office and computer, and my manager shifts were taken away from me.

10. Moreover, Larissa Kagan, the floor manager hired by Minnery, seemed to make it a clear purpose to make my time at work difficult, and aided in creating a hostile and uncomfortable work environment for me. I observed a significant decrease in my wages, and was unreasonably singled out by both Minnery and Kagan in retaliation for my complaints.

11. On Friday July 17, 2015 Kagan left me a voicemail stating that I wasn't needed for my shift, and telling me not to report to work. It was the second time during that week that I was either sent home or told not to report to work. At this point, I contacted Minnery and emailed him my letter of resignation. My letter of resignation detailed some of the reasons for why I felt uncomfortable at work, and why I felt that I needed to resign immediately.

12. The following morning on July 18, 2015, my husband, Gregory Pastor, resigned from his position as a bartender.

13. At approximately 1 p.m. on July 18, 2015, I received a traumatizing text message from Minnery containing images of an obituary, written by him. The obituary was about me, bearing a picture of me downloaded from the internet. That picture was from an article that appeared in the Hartford Courant on September 11, 2014, discussing my dad, Ronald Lawrence Gilligan, who was killed in the September 11, 2001 terrorist attacks.

14. In the obituary, Mr. Minnery stated, "[h]er family was comfortably off by the standards of time, but Ashley nevertheless knew disadvantages . . . with a widowed mother, she was to grow up in a single-parent family". Additionally, it contained a sentence stating that surgical procedures "left her looking like a burn victim with OK tits". When I received this, it sent me into a state of anxiety and panic, as the references made about my family reminded me of what happened to my dad, and also, the pain of having to live in a home without my dad. I received professional counseling and medication as a result of this incident.

15. I also worked with April Lacko at Local Kitchen and Beer Bar (aka "Local") from December 2013 to June 2015. April worked as a bartender, and I worked as a server, and also, was afforded some managerial responsibility in approximately September 2014.

16. During my tenure at Local, I never experienced any difficulties with April either as a co-worker, or from a managerial perspective. I observed that April's performance met and exceeded expectations. When I acted as the manager on shifts where April was working, I never experienced any issues and never had the need to counsel her on her performance. I felt comfortable with April working as she always satisfied the responsibilities of her job. I could depend on her to report to work on time, ready and willing to work.

17. On Sunday June 7, 2015, I was the shift manager and April was working as a bartender. April expressed to me at the beginning of the shift that she wished to leave early, as she made plans and requested the day off.

18.     Another staff member was scheduled to come in later that morning, and I stated that I would be more than willing to allow April to leave early provided that the restaurant was not busy. The other staff member came in as scheduled, but April was not allowed to leave.

19.     Just after the restaurant's open at 10:30 a.m., a group of four people arrived and sat at the bar. While I am not clear on the specific ethnicity of the four people, they appeared to be of Latino/Hispanic descent. From my vantage point, April provided them with quality service during their visit. The only issue that occurred was a side item that was missing from a brunch order. The was quickly rectified, and the guests did not express any further concerns.

20.     About halfway through their visit, I sent April home for the day. The guests were then served by Kristen Rivera, the employee relieving April.

21.     Later in the evening on Sunday June 7, 2015, I received a text message from Christian Minnery. The text message stated that the restaurant received a negative Yelp review in which it was stated that the guests were served by an "older blonde waitress", and alleged that the "restaurant has a racist staff".

22.     In the Yelp review, it was also alleged that the restaurant didn't "want any African Americans at there (sic) establishment".

23.     While I could not be 100% certain that April did/did not wait on the person who wrote this review, I never observed anyone of African-American descent at the bar on Sunday June 7, 2015 while April was working.

24.     In my experience of having worked with April for 18 months, she had many regular patrons of African-American descent who were quite fond of her as a bartender, and I never observed April acting in a racially discriminatory manner.

25. Just a day later, I was made aware by Minnery that he was terminating April as a result of this negative Yelp review. I was asked to write April up for her poor performance on that day, and I refused to comply with his request.

26. One thing that I did observe during the occasions that I worked with April, and the manager, Michael Goclowski, was his overly friendly behavior towards April.

27. Specifically, I often observed Goclowski putting his hands on her shoulders, and behaving in an inappropriate manner, which was clearly uninvited and unreciprocated by April.

28. Seeing Goclowski's behavior, I felt uncomfortable as April's facial expressions indicated that she was not comfortable with his behavior. I often heard Goclowski and Minnery making numerous sexually inappropriate comments during my employment at Local, and observed the laminated beer list with numerous pornographic, sexual references that made me extremely comfortable working there.

_____
Ashley Pastor

Subscribed and sworn to before me
this 13th day of December, 2015.

_____
Notary Public
My Commission Expires: